*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CHARLES ABDULKARIM and SOUAD GHRABY,

        Plaintiffs-Appellees,

v

RONALD S. LEDERMAN, M.D., PLLC, doing business as LEDERMAN KWARTOWITZ CENTER FOR ORTHOPEDICS, RONALD S. LEDERMAN, M.D., and MARK KWARTOWITZ, D.O.,

        Defendants-Appellants,

and

ROYAL OAK SURGICAL CENTER, LLC,

        Defendant.

UNPUBLISHED
October 24, 2019

No. 341950
Oakland Circuit Court
LC No. 2016-151835-NH

Before: MARKEY, P.J., and FORT HOOD and GADOLA, JJ.

GADOLA, J. (*dissenting*).

I respectfully dissent. Quite simply, plaintiffs have utterly failed to meet their burden of producing evidence of a breach of the standard of care by defendant surgeons or, equally as important, by anyone else involved in plaintiff's surgery. Because the law requires more than an undesirable outcome to establish medical malpractice, I would reverse the trial court and remand with instructions to grant defendants' motion for summary disposition.

Plaintiffs offer various theories of liability in this case. These include asserting that Dr. Lederman, the lead surgeon, did not check the patient's grounding pad before surgery, or that he checked the pad and did not notice that it was applied improperly, or that he checked it, found that it was applied improperly, but proceeded with the surgery anyway. Given the lack of actual proof to support any of these direct theories, plaintiffs offer yet another theory of liability—that

someone other than the defendant doctors misapplied the grounding pad, but as the lead surgeon, Dr. Lederman is nonetheless responsible for that person's negligence/malpractice. Unfortunately for plaintiffs, there is zero proof that this occurred either. It is debatable whether Dr. Lederman can be held to account for any malpractice of the nursing staff involved in this procedure, but without any proof that the nursing staff violated the applicable standard of care, there is no basis on which to hold Dr. Lederman accountable on a vicarious liability theory.

Plaintiffs' case rests almost exclusively on the testimony of their expert, Dr. Corn. Dr. Corn testified that when performing similar surgeries himself, he does not place the grounding pad on the patient and does not check the pad to make sure that it has been properly placed on the patient before the procedure begins in about 20% of his surgeries. He further testified that the standard of care does not necessarily require the surgeon to check the pad before the surgery commences and that there would be no reason to check the pad during the surgery unless something went wrong during the procedure. He additionally stated that it is within the standard of care to delegate responsibility to apply the grounding pad to the nursing staff.

For his part, Dr. Lederman testified that he always checks the grounding pad before commencing surgery to ensure that it has been applied properly, and that he did so in this case. He agreed with Dr. Corn that the standard of care does not require the surgeon to check the grounding pad pre-surgery because this is a nursing responsibility, but he nevertheless makes it his routine practice to do so in every case. Normally the electrocautery machine will sound an alarm and stop working if the pad is not placed properly or becomes dislodged, and neither happened in this case. One of the nurses involved in the case testified that there would be no reason for anyone, including the nursing staff, to check the pad during surgery in the absence of the alarm sounding or the machine not working.

To summarize, Dr. Lederman performed his duties within the standard of care *as articulated by plaintiffs' expert witness*, Dr. Corn. He first delegated placement of the pad to the nursing staff, which Dr. Corn testified is routine practice. But beyond this, Dr. Lederman personally checked the pad pre-surgery to ensure it was properly applied, something Dr. Corn testified he does not do in about 20% of his own cases.[1] Dr. Lederman then completed the surgery without incident, with the electrocautery machine performing without interruption and without sounding an alarm.

Despite all this, and with no basis in fact other than the resulting burn on the patient's skin, Dr. Corn concluded that the injury must have occurred as a result of improper placement of

---

[1] Curiously, the lead opinion frames the legal issue in this case as "whether the specific standard of care requires a surgeon to check the placement of a grounding pad before the start of surgery as one that needs to be resolved by a jury." Plaintiffs' own expert testified that the standard of care neither requires the surgeon to place the pad on the patient nor to check its placement pre-surgery. And in any event, Dr. Lederman testified that he always checks the pad before commencing surgery and that he did so in this case. Dr. Lederman's testimony was unrebutted on this point.

the pad. "More likely than not the [grounding pad] was not applied appropriately and there were gaps that were not recognized until after the surgery was done." But even Dr. Corn equivocated when he testified that *either* "poor application or . . . a failure of the adhesive" would cause the grounding pad to become loose. Dr. Corn's testimony is at best equivocal, but is most certainly conclusory and speculative. Not being based in evidence, aside from the fact of the injury itself, Dr. Corn's theory is no more plausible than the alternate possibility of a failure of the adhesive, or Dr. Lederman's equally speculative theory that the pad became loose when the patient's body involuntarily shifted while under the effects of anesthesia. This equivocal and speculative testimony by plaintiffs' expert is not sufficient to establish a breach of the standard of care.

Plaintiffs essentially advocate for a strict liability standard that is simply not the rule in Michigan. The mere fact of injury alone is insufficient to establish a breach of the standard of care in a medical malpractice action; the same must be supported through the use of expert testimony. *Lince v Monson*, 363 Mich 135, 142; 108 NW2d 845 (1961). More recently, in *Bryant v Oakpointe Villa Nursing Centre*, 471 Mich 411, 426; 684 NW2d 864 (2004), the Court stated that "strict liability is inapplicable to either ordinary negligence or medical malpractice." *Id.*, citing MCL 600.2912a *et seq*. "[B]ecause medical malpractice requires proof of negligence," a strict liability claim "is not legally cognizable." *Id*. at 414. Here, plaintiffs have failed to come forward with any proof of active negligence by defendants, aside from the fact of an unwelcome result. Dr. Corn's testimony supports that Dr. Lederman acted within the standard of care, and that he in fact exceeded the standard of care. His testimony that injury occurred due to improper placement of the grounding pad is purely speculative and is no more factually based than other competing theories (e.g., failure of the adhesive pad or of the electrocautery machine to warn of a problem). Furthermore, even if Dr. Corn's speculative theory (improper placement of the pad pre-surgery) were true, it could not be attributed to any negligence on the part of Dr. Lederman.

As noted, Dr. Lederman delegated responsibility for applying the grounding pad to the nursing staff, which Dr. Corn agreed was within the standard of care. Being unable to establish any negligence on the part of Dr. Lederman, plaintiffs posit that he is vicariously liable for the negligence of unidentified others in the operating room. This theory fails as a matter of both fact and law.

Vicarious liability will lie against a principal in the medical malpractice context only when the negligence of the principal's agent can be established. *Al-Shinmari v Detroit Med Center*, 477 Mich 280, 295; 731 NW2d 29 (2007). Just as with Dr. Lederman, plaintiffs have failed to offer proof of negligence on the part of the nursing staff, who were actually responsible for placement of the grounding pad in this case. Instead, they again rely upon Dr. Corn's bald assertion that the grounding pad was improperly placed before the surgery began. Plaintiffs have asserted a general negligence claim against the "surgical staff" involved in the procedure at issue. As our Supreme Court pointed out in *Cox v Flint Bd of Hosp Managers*, 467 Mich 1; 19; 651 NW2d 356 (2002), nurses "do not engage in the practice of medicine." *Id*. at 19. While MCL 600.5838a(1) provides that a medical malpractice claim may be brought against any "licensed health care professional," nurses are subject to their own common law standard of care. *Cox*, 467 Mich at 20.

*Cox* held that a hospital could not be deemed vicariously liable for the negligence of its agents unless "plaintiffs met their burden of proving (1) the applicable standard of care, (2) breach of that standard, (3) injury, and (4) proximate causation between the alleged breach and the injury *with respect to each agent alleged to have been negligent.*" *Id*. at 12 (emphasis in original). The court went on to hold that "in order to find a hospital liable on a vicarious liability theory, the jury must be instructed regarding the specific agents against whom negligence is alleged and the standard of care applicable to each agent." *Id*. at 15. For the same reasons that strict liability cannot be made to apply to Dr. Lederman, the mere fact of injury alone cannot give rise to a malpractice claim against a separate set of professionals for whom plaintiffs allege Dr. Lederman is vicariously liable and against whom there is equally no proof of negligent behavior.

Plaintiffs' and our concurring colleague's reliance upon *Orozco v Henry Ford Hosp*, 408 Mich 248; 290 NW2d 363 (1980), is misplaced and unavailing. In *Orozco*, the trial court directed a verdict in favor of the defendant hospital, and several doctors involved in plaintiff's surgery, despite the fact one of the surgeons was heard to say, "Oops, I cut in the wrong place," and a most unfortunate result ensued. The trial court reasoned that a directed verdict was proper because it could not be determined which surgeon made the admission of negligence and because it was "unclear to what the statement referred." *Id*. at 253.

The Supreme Court unsurprisingly concluded that the admission, "Oops, I cut in the wrong place," coupled with the most unfortunate result of the surgery, was enough to get plaintiff's case to the jury. With respect to the lead surgeon, the Court did indeed state that he "was in charge of the operation," and that he "had a non-delegable duty to see that the operation was performed with due care." *Id*. But critically, the Court's ruling hinged upon the admission of negligence. "The statement made admits error of the type alleged by Orozco and is enough to require the doctor to explain the statement or show that the cut was not the cause of injury." *Id*.

Thus, *Orozco* stands for the limited proposition that a lead surgeon may be held responsible for the malpractice of others in a circumstance where one of the surgeons involved in the procedure (possibly the lead surgeon) makes an admission of negligence. Such is not the case here. Not only is there no admission of negligence, there is a complete absence of proof that anyone involved in the operation behaved in a negligent manner. Quite simply, Dr. Lederman cannot be held to account for the malpractice of others when the same has neither been admitted nor proven.

In fact, the Supreme Court in *Orozco* contrasted that case with *Lince* as follows: "*Lince* was a case where the patient offered only the fact of the injury and the defendant rebutted with an account of the circumstances which led to the complication and independent expert testimony that the doctor's procedures were proper and necessary." *Orozco*, 408 Mich at 253. This case, involving as it does no admission of negligence and no evidentiary proof of negligence by anyone involved in the procedure, is more akin to *Lince* than it is to *Orozco*.

*Locke v Pachtman*, 446 Mich 216; 521 NW2d 786 (1994) is also in accord. *Locke* involved a medical malpractice claim brought against a surgeon when a needle broke during the procedure and could not be retrieved by the surgical team. The Court there stated that key to

*Orozco* was the admission made by the surgeon "*and* corroborating expert testimony. . . ." *Id*. at 228 (emphasis added). Crucially to this case, the Court in *Locke*, in upholding a directed verdict for the defendant surgeon, concluded, "Plaintiff has provided no guidance with regard to what options were available to Dr. Pachtman and which of them she should have chosen. In short, there was no testimony regarding what a reasonably prudent surgeon would have done in Dr. Pachtman's situation." *Id*. at 229.

In the end, neither Dr. Corn nor Dr. Lederman could say with certainty why the injury involved in this case occurred. Despite the fact Dr. Lederman did everything within the standard of care and more, Dr. Corn concluded that the harm occurred because of improper placement of the grounding pad, an activity he conceded was properly delegated to the nursing staff. In the absence of proof that anyone violated the applicable standard[s] of care, speculation on the part of plaintiffs' expert witness is insufficient to withstand defendants' motion for summary disposition. I would therefore reverse.

/s/ Michael F. Gadola